

FILED

May 06 2016, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Demetre Brown, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | May 6, 2016 <br><br> Court of Appeals Cause No. <br> 49A02-1505-CR-391 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa Borges, Judge <br><br> Trial Court Cause No. <br> 49G04-1311-FA-75992 |

**Barnes, Judge.**

## Case Summary

[1]     Demetre Brown appeals his convictions for one count each of Class A felony attempted criminal deviate conduct, Class A felony burglary, Class A felony robbery, Class B felony robbery, Class C felony robbery, two counts of Class A

felony rape, and three counts of Class B felony carjacking. He also appeals his 248-year sentence. We affirm in part and reverse in part.

## Issues

Brown raises four issues, which we restate as:

> I.     whether the trial court properly admitted testimony from Brown's former attorney, testimony from other witnesses regarding information obtained from Brown's former attorney, and physical evidence that Brown's former attorney provided to the State;
>
> II.     whether Brown's three convictions for robbery and three convictions for carjacking violate the single larceny rule;
>
> III.     whether Brown's convictions for Class A felony robbery and Class A felony burglary violate the prohibition against double jeopardy; and
>
> IV.     whether Brown's 248-year sentence is inappropriate in light of the nature of the offenses and his character.

## Facts

During the evening of October 28, 2013, Brown, Trae Spells, Alexander Dupree, Michael Pugh, and Adrian Anthony were together at an apartment at 34th Street and Meridian Street in Indianapolis. At some point, the men left the apartment and went to a party, where they met with Isaiah Hill. The six men left the party together and drove around.

[4]     At approximately 5:00 a.m., they saw a residence on East 79th Street with an open garage door, and they thought it would be an easy target to rob. C.P and E.P. lived at the residence with their twenty-four-year-old daughter, A.P. Their other daughter was away at college. C.P. has a neurological condition that requires him to use leg braces and a cane to walk. The men entered the garage, put gloves on, and went inside the house. C.P. and E.P. were awakened in their upstairs bedroom by the men who were yelling and demanding cash, cell phones, and guns. Brown was carrying Pugh's .38 revolver, and Anthony was also carrying a revolver. When the men realized that C.P. was disabled, they instructed him to stay in bed. E.P., however, was ordered to get up. A.P. heard the commotion and walked toward her parents' bedroom. A.P. offered her purse to the men to end the situation, but she was ordered back to her bedroom. In A.P.'s bedroom, Spells and Brown searched for electronics and jewelry. At some point, one of the men touched the back of A.P.'s leg and her vagina.

[5]     C.P., E.P., and A.P. were repeatedly ordered to keep their heads down and not to look at the men. E.P. was escorted into the hallway by Anthony. Once in the hallway, E.P. ran toward the office to call for help. Anthony, however, shot E.P. in the leg. E.P. was taken downstairs as the men ransacked the house. Anthony led E.P. outside to take her to an ATM, and E.P. attempted to run again. Anthony tackled E.P., led her back inside the house, and shot her in the foot. E.P.'s blood sprayed onto the revolver carried by Brown. One of the men also kicked E.P. on the head. Hill and Anthony then drove E.P. to a nearby

bank to obtain cash from the ATM. When they realized that E.P. did not have the passcode for A.P.'s debit card, they turned around to return to the house. On the way there, Anthony sexually assaulted E.P. At the house, they retrieved C.P.'s debit card, and Anthony forced E.P. to drive him to the ATM. Hill remained at the house. At the ATM, E.P. was able to withdraw $800 at 6:28 a.m.

[6] As E.P. was being forced to withdraw money from the ATM, the men took A.P. downstairs. Dupree and Hill sexually assaulted A.P. in the bathroom, and Hill, Dupree, Brown, and Spells sexually assaulted A.P. in the den. C.P., who was being guarded and forced to stay in his bed, could hear "whooping" sounds coming from the den. Tr. p. 287. C.P. was also beat with a nightstand drawer when he did not answer questions quickly enough.

[7] Anthony returned to the house with E.P. and took A.P. to the bank. At 7:02 a.m., A.P. withdrew $800 from the ATM for Anthony. Anthony tried to touch A.P.'s vagina in the drive-thru lane at the bank. When they returned to the house, Anthony asked E.P. where the others were, and she said they were gone. Anthony took E.P. and A.P. to the master bedroom, and he left the house in E.P.'s Ford Escape. Spells had taken C.P.'s Infiniti sedan, and Brown and Dupree left in A.P.'s Mitsubishi Spyder.

[8] The men abandoned the vehicles and took the stolen items to a shed behind Dupree's mother's house. They left a trail of jewelry on the driveway of Dupree's mother's house. At approximately 11:00 a.m., the six men went to

the apartment of Amanda Burke, who was Pugh's girlfriend, at 34th Street and Meridian Street, where they were recorded on surveillance video.

[9] The home invasion lasted over two hours. A.P. ran to a neighbor's house to obtain help, and E.P. and A.P. were taken to the hospital for treatment. Crime scene investigators began processing the residence. By the next day, Dupree had been identified because his fingerprints were found in the bathroom where A.P. was sexually assaulted. Dupree's phone records showed numerous calls to and from Pugh, and Dupree's phone was located in Burke's apartment building. Pugh was arrested in a vehicle near the apartment building, and he had his revolver, which was splattered with E.P.'s blood, on the floorboard of the vehicle. A woman with Pugh had E.P.'s watch in her purse. Dupree was arrested in Burke's apartment.

[10] Spells was arrested the next day, and he eventually gave a statement implicating himself, Dupree, Pugh, Brown, Anthony, and Hill. DNA evidence also connected Spells to the home invasion and sexual assault of A.P. When Brown was arrested in early November at his mother's house, the assistance of a SWAT team was necessary to arrest him. Anthony was arrested in late November, and he admitted to participating in the home invasion and sexually assaulting E.P. DNA evidence and fingerprints also connected Anthony to the home invasion and sexual assault of E.P. Hill was eventually located in Texas in January 2014. Hill also admitted to participating in the home invasion and the sexual assault of A.P. DNA evidence connected Hill to the home invasion.

[11] The State charged Brown, Anthony, Dupree, Pugh, and Spells with thirty-five counts each, including twelve counts of Class A felony criminal deviate conduct, four counts of Class A felony rape, two counts of Class A felony attempted criminal deviate conduct, three counts of Class B felony robbery, three counts of Class B felony carjacking, three counts of Class B felony criminal confinement, two counts of Class C felony intimidation, one count of Class B felony aggravated battery, one count of Class A misdemeanor battery by bodily waste, two counts of Class C felony battery, one count of Class A misdemeanor battery, and one count of Class A felony burglary.[1]

[12] Attorney Heather Barton was retained by Brown's family to represent him in a different criminal matter, and she spoke with Brown in a holding cell after a hearing in that case. Barton then contacted Brown's mother and made arrangements to meet with her at her house. While Barton was at Brown's mother's house, Barton indicated that she was looking for a white box and a gun, and they searched for the items. Brown's brother gave her a white laptop, which Barton took to her office. Barton examined the laptop and discovered that it was "likely the proceeds of a crime." App. p. 196. Barton then called the prosecutor's office and turned the laptop over to the police. The laptop belonged to A.P., and Brown's fingerprint was found on the laptop.

---

[1] Spells pled guilty, and Hill was charged separately.

[13] Brown filed a motion to exclude evidence obtained directly or indirectly "in violation of the attorney-client privilege." App. p. 171. The State argued that a confidential communication was not involved because "it occurred in the presence and hearing of at least fifteen disinterested individuals." App. p. 388. Alternatively, the State argued that Barton's testimony would relate only to her actions, "not to the words or advice shared between she and her client . . . ." *Id.* at 389. After a hearing, the trial court denied Brown's motion to exclude Barton's testimony but ordered that her testimony be limited regarding "where the information was gleaned." Tr. p. 1473.

[14] Brown, Pugh, Anthony, and Dupree were tried together, and the jury trial was held in March 2015. Barton testified over Brown's objection.[2] Barton testified that she met with Brown and, after the meeting, she went to Brown's mother's home to "retrieve some items." Tr. p. 704. She was assisted by Brown's mother, his brother, and the mother's boyfriend. Brown's brother gave her the laptop, which she took to her office. Barton's stepson assisted her with the laptop, and she discovered that the owner of the laptop was associated with this action. She then contacted the prosecutor's office and the police, and officers retrieved the laptop from her office. The fact that Barton was an attorney representing Brown was not mentioned during the testimony. Spells also testified against the defendants.

---

[2] Barton did not represent Brown in this matter.

During the trial, the State dismissed seven of the charges. The jury ultimately found Brown guilty of twenty counts: four counts of Class A felony rape, two counts of Class A felony attempted criminal deviate conduct, two counts of Class B felony robbery, three counts of Class B felony carjacking, three counts of Class B felony criminal confinement, two counts of Class C felony intimidation, Class B felony aggravated battery, Class A felony robbery, Class C felony battery, and Class A felony burglary. Due to double jeopardy concerns, the trial court imposed a sentence on only ten counts: one count each of Class A felony attempted criminal deviate conduct, Class A felony burglary, Class A felony robbery, Class B felony robbery, Class C felony robbery, two counts of Class A felony rape, and three counts of Class B felony carjacking. The trial court sentenced Brown to fifty years on each of the Class A felony convictions, twenty years on each of the Class B felony convictions, and eight years on the Class C felony conviction. The trial court then ordered Brown to serve the sentences for the rape and attempted criminal deviate conduct convictions related to A.P. concurrently and to serve the sentences for the carjacking convictions concurrently. The remainder of the sentences were ordered to be served consecutively for an aggregate sentence of 248 years in the Department of Correction. Brown now appeals.

## Analysis

### I. Attorney-Client Privilege

Brown argues that the trial court abused its discretion by admitting Barton's testimony, testimony from other witnesses regarding information obtained from

Barton, and the physical evidence that Barton provided to the State. According to Brown, Barton violated the attorney-client privilege by revealing information relating to her representation of Brown. The State concedes that Brown and Barton had an attorney-client relationship but argues that there was no privileged communication involved here.

[17] Indiana Code Section 34-46-3-1(a) provides that: "Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications: (1) Attorneys, as to confidential communications made to them in the course of their professional business, and as to advice given in such cases." The attorney-client privilege protects against judicially-compelled disclosure of confidential information. *Lahr v. State*, 731 N.E.2d 479, 482 (Ind. Ct. App. 2000). The harm to be prevented is not the manner in which the confidence is revealed, but the revelation itself. *Id.* "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677 (1981)). Furthermore, the privilege allows both the attorney and the client to give complete and confidential information, so that both may be fully advised regarding the attorney's services to the client, and the client is assured that confidences are not violated. *Id.*

[18] In construing this statute, our supreme court has determined that the burden rests with the person who asserts the privilege to show by a preponderance of the evidence: (1) the existence of an attorney-client relationship; and (2) that a

confidential communication was involved. *Mayberry v. State*, 670 N.E.2d 1262, 1266 (Ind. 1996). Because the privilege prevents the disclosure of relevant information and impedes the quest for truth, the privilege should be narrowly construed. *Shanabarger v. State*, 798 N.E.2d 210, 215-16 (Ind. Ct. App. 2003), *trans. denied*.

[19] We have significant concerns and deep reservations about the events that occurred here and Barton's questionable conduct. Brown correctly points out that there are attorney professional conduct rules implicated. *See* Ind. Professional Conduct Rule 1.6(a) ("A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."). However, Brown cites no authority for the proposition that an ethical violation should result in the exclusion of evidence in a criminal trial unless it violates the attorney-client privilege statute.

[20] Despite our concerns about Barton's conduct, we need not and do not address whether the trial court erred by admitting the evidence at issue because any error was harmless. Brown must also show that any error was prejudicial to his substantial rights. *Williams v. State*, 43 N.E.3d 578, 583 (Ind. 2015). In evaluating whether erroneously-admitted evidence was prejudicial, we assess its "probable impact . . . upon the jury in light of all of the other evidence that was properly presented. If we are satisfied the conviction is supported by independent evidence of guilt[,] . . . the error is harmless." *Id.* "Put another

way, 'we judge whether the jury's verdict was substantially swayed. If the error had substantial influence, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Lafayette v. State*, 917 N.E.2d 660, 666-67 (Ind. 2009)).

[21]     Brown argues that his DNA and fingerprints were not found on the victims, in their home, or on their vehicles and that the laptop and his fingerprint on the laptop were a substantial aspect of the State's case. However, the State also presented evidence that Brown was seen on surveillance video with the other defendants a short time after the home invasion, the help of a SWAT team was necessary to effectuate Brown's arrest, and Spells testified extensively against Brown and the other defendants. *See Jenkins v. State*, 909 N.E.2d 1080, 1083 (Ind. Ct. App. 2009) (noting that flight leads to a reasonable inference of guilt), *trans. denied.* Spells's testimony was largely consistent with the testimonies of the victims and the physical evidence found. Brown questions Spells's credibility and points out that Spells testified that four men, including Brown, raped A.P. and that A.P. testified to three rapes. However, the jury clearly found Spells's testimony credible. Given Spells's testimony, its consistency with the victims' testimonies, the video surveillance of Brown and the other defendants shortly after the home invasion, and Brown's attempt to evade capture, we are satisfied that the convictions are supported by independent evidence and that any error in the admission of Barton's testimony, the laptop, and fingerprint evidence was harmless. *See, e.g., Russell v. State*, 743 N.E.2d 269 (Ind. 2001) (holding that the admission of the defendant's wife's testimony in violation of the spousal privilege was harmless error).

## II. Single Larceny Rule

[22]     Brown argues that his convictions for three counts of robbery (Counts XIII, XVIII, and XXXIII) and three counts of carjacking (Counts XIV, XXVII, and XXXII) violate the single larceny rule. According to Brown, there should be "one conviction, not six." Appellant's Br. p. 43.

[23]     The single larceny rule has historically provided that "'when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons there is but a single 'larceny', i.e. a single offense.'" *Curtis v. State*, 42 N.E.3d 529, 534 (Ind. Ct. App. 2015) (quoting *Raines v. State*, 514 N.E.2d 298, 300 (Ind. 1987)), *trans. denied*. "The rationale behind this rule is that the taking of several articles at the same time from the same place is pursuant to a single intent and design." *Id.* "If only one offense is committed, there may be but one judgment and one sentence." *Id.*

[24]     With respect to the robbery charges, Count XIII alleged that Brown "did knowingly, while armed with a deadly weapon, that is: a handgun, take from [A.P.] property, that is: currency, and/or computer, and/or jewelry, and/or keys, and/or television, and/or cellular phone, by putting [A.P.] in fear or by using or threatening the use of force on [A.P.]." App. p. 66. Count XVIII alleged that Brown "did knowingly, while armed with a deadly weapon, that is: a handgun, take from [E.P.] property, that is: currency, and/or watch, and/or jewelry, and/or keys, and/or television, and/or cellular phone, by putting [E.P.] in fear or by using or threatening the use of force on [E.P.] . . . ." *Id.* at 67-68. Count XXXIII alleged that Brown "did knowingly, while armed with a

deadly weapon, that is: a handgun, take from [C.P.] property, that is: currency, and/or computer, and/or television, and/or cellular phone, and/or keys, by putting [C.P.] in fear or by using or threatening the use of force on [C.P.]." *Id.* at 71.

[25] With respect to the carjacking charges, Count XIV alleged that Brown "did knowingly take from [A.P.] a motor vehicle, that is: a Mitsubishi convertible, by putting [A.P.] in fear or by using or threatening the use of force on [A.P.]." *Id.* at 66. Count XXVII alleged that Brown "did knowingly take from [E.P.] a motor vehicle, that is: a Ford Escape, by putting [E.P.] in fear or by using or threatening the use of force on [E.P.]." *Id.* at 269. Count XXXII alleged that Brown "did knowingly take from [C.P.] a motor vehicle, that is: an Infinity sedan, by putting [C.P.] in fear or by using or threatening the use of force on [C.P.]." *Id.* at 71.

[26] Our supreme court has held that the single larceny rule "does not apply to the situation . . . where a robber has taken the individual property of separate individuals." *Ferguson v. State*, 273 Ind. 468, 475, 405 N.E.2d 902, 906 (1980); *see also Curtis*, 42 N.E.3d at 536 (holding that the single larceny rule did not apply where the defendant "first robbed Shweiki, in her capacity as an employee of CVS, of property belonging to the pharmacy, i.e., the Opana pills [and] then robbed Williams of her personal property, i.e., her car keys"). The defendants here robbed and carjacked multiple victims, C.P., E.P., and A.P. Consequently, the single larceny rule does not apply as between the robbery

charges, i.e., robbing C.P., E.P., and A.P., or as between the carjacking charges, i.e., carjacking C.P., E.P., and A.P.

[27] The only remaining issue is whether Brown's convictions for robbing each individual victim and also carjacking the same victim, i.e., robbing C.P. and also carjacking C.P., violate the single larceny rule. A.P. and E.P. were robbed of several items, including currency at a bank several blocks away from the residence, and they were carjacked later as the defendants were leaving the residence. The currency and vehicles were not taken at the same time and from the same place, so the single larceny rule is inapplicable. *See, e.g., Bivens v. State*, 642 N.E.2d 928, 945 (Ind. 1994) (holding that the single larceny rule was inapplicable where the defendant stole money and a credit card from the victim's motel room and the victim's automobile from the motel parking lot).

[28] The charges related to C.P. require additional analysis. C.P. was robbed while he was at the residence and his vehicle was also taken from outside the residence. Despite the close locations of the offenses, we also conclude that the single larceny rule is inapplicable. We addressed a similar situation in *J.R. v. State*, 982 N.E.2d 1037 (Ind. Ct. App. 2013), *trans. denied*. In *J.R.*, a juvenile defendant burglarized a residence and also took a vehicle from the attached garage. He was alleged to be delinquent because he had committed, in part, acts that would be Class D felony theft and Class D felony auto theft, and the trial court entered true findings. On appeal, he argued that the theft and auto theft adjudications could not stand under the single larceny rule. We concluded that, although the offenses occurred at the same time and at the same residence,

they were "distinct because they each involved the violation of a different statute."[3] *Id.* at 1039; *see also Curtis*, 42 N.E.3d at 538 (holding, in part, that the armed robbery and auto theft convictions were separate and distinct crimes and were not subject to the single larceny rule). For the reasons discussed in *J.R.*, we also conclude that the robbery and carjacking convictions related to C.P. are not subject to the single larceny rule.

### III. Double Jeopardy

[29] Brown argues that his convictions for Class A felony robbery (Count XVIII) and Class A felony burglary (Count XXXV) violate the prohibition against double jeopardy. According to Brown, the same bodily injury to E.P. enhanced both the burglary and robbery convictions. The State concedes that the elevation of both the robbery and burglary convictions to Class A felonies based on the same serious bodily injury violates the prohibition against double jeopardy. Appellee's Br. p. 49 (citing *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002)). The State suggests that the appropriate remedy is for this court to reduce the robbery conviction to a Class B felony and adjust the sentence for that conviction from fifty years to twenty years. In his reply brief, Brown agrees that this is an appropriate remedy. Consequently, we reduce the robbery conviction in Count XVIII to a Class B felony and adjust Brown's sentence to

---

[3] In *J.R.*, we distinguished *Stout v. State*, 479 N.E.2d 563 (Ind. 1985), where the defendant was charged with two counts of theft—one for the theft of personal property and one for the theft of an automobile—because the offense of auto theft was not a distinct statute at that time.

twenty years instead of fifty years for this conviction. The State and Brown agree that this results in an aggregate sentence of 218 years.

## IV. Sentence

[30] Brown argues that his 248-year sentence is inappropriate. Given our resolution of the double jeopardy issue presented by Brown, we will review whether his adjusted 218-year sentence is inappropriate.

[31] Indiana Appellate Rule 7(B) permits us to revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Although Appellate Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." *Id.*

[32] The principal role of Appellate Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the

sentence on any individual count." *Id.* Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. *Id.* at 1224.

[33] Brown argues that his sentence (now 218 years) is functionally equivalent to life without parole but that he is statutorily ineligible for life without parole. We have previously rejected similar arguments. *See Wright v. State*, 916 N.E.2d 269, 279-80 (Ind. Ct. App. 2009), *trans. denied*. Life without parole is a specific sentence which is authorized in specific instances and applies to sentencing an individual on one count. *Id.* Here, Brown's sentence is based on his ten convictions. Although Brown's combined sentence exceeds his expected life span, his sentence is nevertheless a term of years and does not officially foreclose the possibility of parole, however slight. *See id.*

[34] The nature of the offenses in this case were appropriately described by the trial court as "unbelievably aggravating." Tr. p. 1429. The trial court noted that the victims were "in the sanctity of their home where they [were] not just attacked, not just burglarized or robbed, but humiliated, literally humiliated, and treated as if they were nothing." *Id.* Brown and his co-defendants invaded the victims' home, threatened and intimidated them, robbed them, ransacked their home, shot E.P. twice, sexually assaulted E.P., sexually assaulted A.P., and beat C.P. The home invasion was horrific and lasted two hours.

As for twenty-one-year-old Brown's character, he was arrested eleven times as a juvenile, resulting in true findings for what would have been Class A misdemeanor carrying a handgun without a license, Class B felony burglary, Class D felony auto theft, and Class B misdemeanor public intoxication. As an adult, Brown was convicted of Class C misdemeanor illegal possession of an alcoholic beverage, Class A misdemeanor possession of marijuana, Class A misdemeanor driving with a suspended license on two occasions, and Class A misdemeanor battery. Although Brown argues that these convictions are "unrelated" to the instant offenses, we disagree. Rather, we agree with the State that his prior criminal history was "a primer to the present offenses" and is highly relevant. Appellee's Br. p. 55. The trial court noted Brown's ADHD, an unnamed "emotional disorder," and his substance abuse. Tr. p. 1431. However, we find none of these factors warrants a reduction of Brown's sentence. Given the horrific nature of the crimes and Brown's criminal history, we conclude that the 218-year sentence is not inappropriate.

## Conclusion

We conclude that any error in the admission of Barton's testimony, the laptop, and Brown's fingerprint on the laptop was harmless. Brown's single larceny rule argument fails, but based on the prohibition against double jeopardy, we reduce his Class A felony robbery conviction to a Class B felony and adjust his sentence for that conviction from fifty years to twenty years. Additionally, we find that his adjusted 218-year sentence is not inappropriate. We affirm in part and reverse in part.

Affirmed in part and reversed in part.

Vaidik, C.J., and Mathias, J., concur.