**Sean WRIGHT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–0905–CR–259.**

Court of Appeals of Indiana.

Nov. 10, 2009.

Transfer Denied Jan. 7, 2010.

---

Matthew D. Anglemeyer, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant–Defendant Sean Wright appeals his convictions, following a jury trial, for three counts of Murder,[1] a felony, and his accompanying sentence of 165 years. Upon appeal, Wright challenges his convictions by claiming that certain victim statements admitted against him violated his Sixth Amendment right to confrontation under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); certain of his own statements were procured in violation of his right against self-incrimination, his right to remain silent, and his right to secure an attorney under the United States and Indiana Constitutions; and that his 165–year sentence is inappropriate in light of his mental illness. In addition Wright argues that his sentence is effectively a life sentence and that he should have received the protections of Indiana Code section 35–50–2–9 (2007), which provides for sentences of life without parole. We affirm.

## FACTS AND PROCEDURAL HISTORY

In September 2007, Wright lived with his mother, Flossie Wright, and her two foster sons, R.A. and D.N., at 4531 Shady Lane in Indianapolis. At approximately 10:20 p.m. and again at approximately 10:45 or 11:00 p.m. the night of September 15, 2007, Deandra Wilkins, who lived across the street at 4532 Shady Lane, saw Wright standing outside Flossie's home. The garage door was open, and Flossie's vehicle was inside the garage.

Hours later, at approximately 1:00 a.m. the morning of September 16, 2007, Wilkins awoke to the sound of a loud thump against her front door followed by multiple cries for help. Wilkins called the police because she was unable to see her front porch in the dark.

Upon being dispatched to the scene at 1:19 a.m., Indianapolis Metropolitan Police Officer Robert Stradling observed an individual, bleeding profusely and wearing no clothes, lying face down on Wilkins's front porch. Officer Stradling summoned an ambulance and approached the individual, whom he determined to be a young man. The young man, later identified to be Flossie's sixteen-year-old foster son R.A., had sustained sixteen stab wounds, many of them to his face, neck, chest, back, and hands. The wounds were inflicted with such force that they passed through bone, including R.A.'s scapula, and caused significant tissue and vascular damage, piercing R.A.'s left lung, puncturing his right carotid artery, right jugular vein, subclavian vein and superior vena cava, and cutting his larynx. In addition, R.A. had sustained significant arm and hand wounds, including one which cut fully through his right hand, and another which cut the tops off of his right second and third fingers.

Officer Stradling returned to his vehicle for a first aid kit and sought to administer first aid by covering certain puncture wounds in R.A.'s back, which were losing "frothy" blood.[2] Tr. p. 234. In doing this, Officer Stradling was trying to stop R.A.'s bleeding and help him breathe. As Officer Stradling pressed on his wounds, R.A., though very weak, succeeded in pushing himself up on his elbows and rolling over onto his back. At this point, Wilkins, who had come to her front door, identified R.A. as her neighbor who lived across the street.

---

1. Ind.Code § 35–42–1–1 (2007).

2. The appearance of "frothy" blood suggested to Officer Stradling that R.A. was breathing through his puncture wounds.

Officer Stradling asked R.A., "Who did this?", and R.A. replied, "Sean." Tr. p. 237. Officer Stradling asked again, "Did you say Sean?", and R.A. confirmed this by nodding his head or repeating the name. Tr. p. 237. Officer Stradling then asked who "Sean" was, to which R.A. responded by saying, "Uncle" either once or twice. Tr. p. 237. According to Officer Stradling, Wilkins told him that there was a man named "Sean" whom everyone called "Uncle" who lived directly across the street from her house. Shortly thereafter, paramedics transported R.A. to the hospital, where he died approximately two hours later.

Authorities discovered significant blood stains on Shady Lane, as well as a large amount of blood on the back patio and back door of Flossie's house across the street at 4531 Shady Lane. Upon entering Flossie's house, authorities discovered ten-year-old D.N. and sixty-year-old Flossie, both of whom were determined to be deceased due to multiple stab wounds. D.N. was found lying on his back on a couch in the den with seven stab wounds, one of which was large and deep enough to cut through his entire body, including his aorta, and caused his intestines to protrude. Another wound, to D.N.'s chest, penetrated his chest cavity, lung, diaphragm, spleen, and stomach. D.N. also sustained a stab wound to his back and multiple defense wounds to his left arm.

Flossie had similarly sustained severe stab wounds, and was found lying on the floor in a bedroom next to the bed. Among her twelve wounds was a five-inch-deep gash which traveled completely through her chest cavity, penetrating her chest wall and both her upper and lower left lung lobes, and fracturing her ribs. In addition, Flossie sustained a stab wound to the right side of her body which fractured her ribs and injured her right lung, and stab wounds to her back which further injured her lungs. Flossie also suffered additional wounds to her right arm, right knee, and right breast.

Inside Flossie's house, which had no broken windows or doors or other signs of forced entry, authorities also discovered an empty bedroom with R.A.'s first name painted on the wall. The room contained a bloody wall and bed. The rest of the house was in a general state of disarray, with broken and overturned furniture in the living room/dining room area and blood on the walls and floor. The basement where Wright usually slept, in contrast, was undisturbed. Authorities found additional blood on the floor in the garage. The garage door was down, and there was no vehicle inside.

On the night in question, Flossie spoke on her land line telephone to Irma Nichols from 11:13 p.m. until 12:09 a.m. At approximately 1:14 a.m. the morning of September 16, Wright's girlfriend Monika Thompson received a phone call from Wright, who was using Flossie's cell phone. Wright asked Thompson, "What are you doing?", and Thompson replied that she was sleeping, after which Wright ended the call. Tr. p. 920. Hours later, at approximately 9:06 a.m., 9:08 a.m., 9:09 a.m., 9:14 a.m., and 9:20 a.m., Wright again called Thompson, who by this time had heard of Flossie's death. Thompson asked Wright what he had done, and Wright answered that he had done nothing. Wright also stated that he had been "set up." Tr. p. 922. Also the morning of September 16, Wright called Flossie's friend Haskins, who by that point was aware of the deaths, and asked her what was wrong. When Haskins responded, Wright hung up the phone. A couple of hours later, Wright again called Haskins to ask what was wrong. Haskins told him that "they said" he had killed his mother

and two boys. Tr. p. 213. Wright again hung up the phone. When Wright called back later that afternoon, he reported that he was hurt.

Wright also called his minister Michael Icenberg from Flossie's phone the morning of September 16, 2007. Prior to that date, Icenberg had invited Wright to church, but Wright had not yet accepted that offer. At 8:19 a.m. on September 16, 2007, Wright called Icenberg and indicated his wish to attend church that morning. Icenberg told Wright he would pick him up. As Icenberg, who was unaware of the events on Shady Lane, headed toward Wright's Shady Lane address, Wright called again to tell him he was at a different location. Icenberg was unable to determine Wright's location in the short time he had before the church service, so Icenberg proceeded to church without Wright.

After being subsequently informed of the incidents on Shady Lane and notifying police, Icenberg called Wright, who called him back and requested a ride. Icenberg drove with an undercover detective to Wright's reported location near the intersection of East Raymond and South Sloan Streets, where authorities arrested Wright.

At the time of his arrest, Wright was bleeding from certain flesh wounds to his abdomen, yet there were no corresponding cuts to his clothing. Apart from the wounds to his abdomen, Wright did not appear to be suffering from any other injuries, such as a head wound, nor did he complain of any. Authorities found Flossie's vehicle approximately two blocks from the location of Wright's arrest. There were multiple blood stains inside the vehicle.

Authorities brought Wright to the police department, where Indianapolis Metropolitan Police Officers Edward Miller and Edward Brickley read him his Miranda rights and questioned him. During the interrogation, Wright stated, "I probably need a lawyer," and, "I'm pretty sure I do need a lawyer," after which the interrogation ended. State's Exh. 1, p. 6. After approximately five minutes, during which Wright was told he was under arrest for triple homicide, Wright indicated that he wished to speak further. Wright was re-read his Miranda rights, and the questioning continued. During this second interrogation, Wright admitted to having been at his home at 4531 Shady Lane that day but claimed he had been hit on the head and recalled nothing until he woke up near the intersection of Raymond and Sloan Streets and found he had been stabbed in the abdomen. Wright admitted that he had not sustained any head wounds during the alleged attack.

Pathologist Joye Carter, M.D. subsequently opined that the wounds to Wright's abdomen appeared to have been self-inflicted and were more recent than the wounds sustained by Flossie, R.A., and D.N. Blood stains discovered on Wright's shoes were determined through DNA analysis to match Flossie and R.A. Certain blood stains found in Flossie's vehicle were determined through DNA analysis to match R.A. Other blood stains in the vehicle were determined to be consistent with the mixed blood of Flossie, R.A., D.N., and Wright.

On September 19, 2007, the State charged Wright with three counts of murder. Prior to trial, Wright moved to suppress his statements during questioning by Officers Miller and Brickley on the grounds that he had not knowingly and voluntarily waived his Miranda rights. Wright further sought to suppress R.A.'s statements identifying the perpetrator as "Sean" and "Uncle" on the grounds that such statements violated his right to con-

frontation under *Crawford.* The trial court denied both motions.

Following a March 10–12, 2009 jury trial, during which Wright's and R.A.'s statements were entered into evidence over Wright's renewed objections, Wright was found guilty of three counts of murder as charged. During an April 8, 2009 sentencing hearing, the trial court sentenced Wright to consecutive terms of fifty-five years on each count, for an aggregate sentence of 165 years in the Department of Correction. In imposing this sentence, the trial court found Wright's mental illness to be a significant mitigating circumstance, which, together with the mitigating circumstance of hardship to his dependents, was outweighed by the aggravating circumstances of his criminal history, probation status, young age of victim D.N., multiple victims, and nature and circumstances of the crimes. This appeal follows.

## DISCUSSION AND DECISION

### I. Admissibility of Evidence

■ Upon appeal, Wright challenges the admissibility of both R.A.'s statements identifying the perpetrator as "Sean" and "Uncle" and his statements to Officers Miller and Brickley during questioning. Our standard of review on the admissibility of evidence is the same whether the challenge is made by a pre-trial motion to suppress or by a trial objection. *Ackerman v. State,* 774 N.E.2d 970, 974 (Ind.Ct. App.2002), *trans. denied.* The admission of evidence is left to the sound discretion of the trial court, and this court will not reverse that decision absent an abuse of discretion. *Weis v. State,* 825 N.E.2d 896, 900 (Ind.Ct.App.2005). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

### A. R.A.'s Statements

#### 1. Dying Declaration

■ Wright argues that R.A.'s statements were inadmissible because they violated his right to confrontation under *Crawford.* In making this argument, Wright concedes that the rule in *Crawford* has a well-recognized exception for dying declarations. *See Wallace v. State,* 836 N.E.2d 985, 996 (Ind.Ct.App.2005) (concluding that *Crawford* neither explicitly nor impliedly signals that the dying declaration exception to hearsay runs afoul of an accused's Sixth Amendment right to confrontation), *trans. denied.* We first consider, therefore, whether R.A.'s statements were dying declarations and therefore not subject to *Crawford.*

■ Although generally inadmissible, hearsay is admissible under the "dying declaration" exception if a declarant makes a statement "while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Ind. Evid. R. 804(b)(2). This statement must be made by a person who knew death was imminent and had abandoned all hope of recovery. *Wallace,* 836 N.E.2d at 991 (citing *Anderson v. State,* 471 N.E.2d 291, 292 (Ind.1984)). In order to determine if a declarant made statements with the belief that "death was imminent" while having "abandoned all hope of recovery," the trial court may consider "'the general statements, conduct, manner, symptoms, and condition of the declarant, which flow as the reasonable and natural results from the extent and character of his wound, or state of his illness.'" *Wallace,* 836 N.E.2d at 991 (quoting *Beverly v. State,* 801 N.E.2d 1254, 1260 (Ind.Ct.App.2004) (internal quotation omitted)).

At the time R.A. made the statements at issue he was lying on a neighbor's front

porch having sustained sixteen severe stab wounds to his face, neck, chest, and back; blood was "pouring" from his body; he had labored breathing and "gurgly" speech; he was noticeably weak and in great pain; and he was calling for help after somehow having dragged himself across the street to seek it out. Tr. pp. 230, 259. R.A.'s extraordinary efforts in the face of such trauma do not serve to undermine the precarious nature of his condition. The trial court was well within its discretion to conclude from the above facts that R.A. was *in extremis* and that his statements to Officer Stradling were made with the belief that death was imminent and that he had abandoned all hope of recovery. *See id.*

### 2. *Crawford v. Washington*

Even if, as Wright contends, R.A.'s statements were not dying declarations, they do not run afoul of his Sixth Amendment right to confrontation. As a general matter, hearsay which is permitted under the rules of evidence is also subject to the defendant's right "to be confronted with the witnesses against him" under the Sixth Amendment to the United States Constitution. *Crawford,* 541 U.S. at 38, 124 S.Ct. 1354. Under *Crawford,* the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. 1354. Although the *Crawford* court did not provide a precise definition of "testimonial," the United States Supreme Court revisited the question in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court clarified the meaning of "testimonial" by explaining as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266. In concluding that the statements at issue in *Davis* were not testimonial, the Court considered the following factors: (1) whether the declarant was speaking about events as they were actually happening or describing past events; (2) whether the declarant was facing an ongoing emergency; (3) whether the questions asked by law enforcement were such that they elicited statements necessary to resolve the present emergency rather than simply to learn about past events; and (4) the level of formality of the interrogation. *Collins v. State,* 873 N.E.2d 149, 154 (Ind.Ct.App.2007) (citing *Davis,* 547 U.S. at 827–28, 126 S.Ct. 2266), *trans. denied, see also Gayden v. State,* 863 N.E.2d 1193, 1197 (Ind.Ct.App.2007), *trans. denied.*

Upon applying these factors to the facts of the instant case, we conclude that R.A.'s statements were not testimonial. While R.A.'s statements referenced the stabbing acts, which had technically occurred in the (very recent) past, they also referenced his very present injuries. Given the immediacy of these injuries at the time of R.A.'s statements, we cannot say that he was merely referencing past, or even recent past, events. With respect to the second factor, R.A.'s condition in itself adequately demonstrates the emergency nature of the situation. In addition, Officer Stradling and R.A. were awaiting paramedics, and, indeed, the homicide unit, at the time of R.A.'s statements. Regarding

the third factor, Officer Stradling, who had found a bloody R.A. on a neighbor's front porch in the middle of the night, was merely attempting to address what was clearly an unresolved situation. To the extent Officer Stradling's inquiry into the perpetrator's identity is claimed to be investigatory, such inquiries have been deemed necessary to resolve situations—such as the one at issue here—where it is imperative that dispatched officers know they might be encountering a violent felon. *See Davis*, 547 U.S. at 827, 126 S.Ct. 2266. Finally, there is little question as to the informal nature of this "interrogation," which occurred when Officer Stradling was dispatched to assist R.A. as he lay dying, in the middle of the night, on his neighbor's front doorstep. We are convinced that R.A.'s statements were elicited for purposes of resolving the emergency at hand, not in preparation for future litigation, and were therefore nontestimonial. Accordingly, we reject Wright's claim that the introduction of such statements into evidence violated his Sixth Amendment right to confrontation. *See Collins*, 873 N.E.2d at 154–55 (concluding that statements identifying shooter were nontestimonial when made by agitated declarant during 911 call shortly after he had witnessed shooting); *Gayden*, 863 N.E.2d at 1197–99 (concluding that portion of 911 call during which frantic declarant identified perpetrator within minutes of his alleged acts was nontestimonial).

### B. Wright's Statements

 Wright argues that the incriminating statements he made to Officers Miller and Brickley were not given voluntarily and therefore were inadmissible because they were elicited in violation of the United States and Indiana Constitutions. The Fourteenth Amendment of the United States Constitution incorporates the Fifth Amendment's privilege against self-incrimination. *Withrow v. Williams*, 507 U.S. 680, 689, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Therefore, to be admissible consistent with those provisions, a suspect's confession must be voluntarily given. *Carter v. State*, 686 N.E.2d 1254, 1258 (Ind.1997). Under the United States Constitution, the State must prove by a preponderance of the evidence that the defendant's confession was voluntary. *Clark v. State*, 808 N.E.2d 1183, 1191 (Ind.2004). Under the Indiana Constitution, the State must show voluntariness beyond a reasonable doubt. *Id.*

The voluntariness of a defendant's confession is determined from the totality of the circumstances. *Washington v. State*, 808 N.E.2d 617, 622 (Ind.2004). In turn, the "totality of the circumstances" test focuses on the entire interrogation rather than on any single act by police or condition of the suspect. *Id.* We review the record for evidence of inducement by way of violence, threats, promises, or other improper influences. *Id.* The decision whether to admit a defendant's confession is within the discretion of the trial court, and we will not reverse such decision absent an abuse of discretion. *See Carter v. State*, 730 N.E.2d 155, 157 (Ind.2000). Upon reviewing a challenge to the trial court's decision to admit the defendant's confession, we do not reweigh the evidence but instead examine the record for substantial probative evidence of voluntariness. *Id.*

Wright argues that he invoked his Fifth Amendment right to silence and to an attorney during questioning and that his subsequent statement was involuntarily made given his physical and mental infirmities at the time. Wright further argues that his reinitiation of police questioning, which occurred after authorities informed him of his triple-murder charges, was more the result of police coercion than his own volition.

Based upon the totality of the circumstances, we conclude that Wright's statements during questioning were knowing and voluntary under both the United States and Indiana Constitutions. Although Wright was suffering from flesh wounds and possibly from mental illness at the time of his statements, nothing from the record suggests that these infirmities affected the knowing and voluntary nature of his statements. According to Officer Miller, Wright's physical injuries did not appear to affect his demeanor prior to questioning, and nothing from Wright's mental condition suggested that this affected his understanding. Indeed, while Wright indicated, after requesting a lawyer, that he was not feeling well, he nevertheless reinitiated questioning. Afterward, Wright repeatedly indicated, with unequivocal "Yes sir's," that he understood his rights and that he truly wished to continue with questioning, further underscoring Wright's comprehension of both the circumstances and the elective nature of the questioning. Exh. 1, pp. 7–10. Wright's contention that, in spite of his representations, his physical and mental state overcame his volition is purely speculative and unsupported by the record.

Moreover, nothing from the record indicates that Wright was subject to violence, threats, promises or other improper influences by authorities. Indeed, Officer Miller read Wright his rights, stopped the questioning entirely at Wright's request, then resumed questioning only after re-reading Wright his rights and confirming that it was Wright's initiative and wish to continue the conversation. The only apparent influence on Wright was his self-imposed compulsion to deny culpability for the triple murder charges against him. Without any evidence of a debilitating physical or mental condition or improper influence by authorities, we reject Wright's contention that his incriminating statements were not knowing and voluntary under either the United States or the Indiana Constitutions.[3]

To the extent the above evaluation rests upon the validity of Wright's reinitiation of police questioning, we reject Wright's additional argument that he was somehow coerced into reinitiating this questioning by Officer Miller's informing him of the charges against him. Merely informing a suspect of the charges against him is not unduly influential, nor does it overcome his will. To the contrary, it is to a suspect's distinct advantage to know the nature of the charges against him, and an informed suspect who reinitiates questioning cannot point to his full understanding of the circumstances at issue to undermine the reliability of his actions. For these reasons, we are similarly unable to conclude that Officers Miller's and Brickley's informing Wright of the basis for his arrest operates as the "functional equivalent" of interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (excepting from "interrogation" words or actions on the part of police which are "normally attendant to arrest and custody"). Wright's challenge to the admissibility of his statements warrants no relief.

---

**3.** Under the federal standard, a person's mental or physical condition alone will not render his confession involuntary, and coercive police activity is a necessary predicate to a finding that a confession is involuntary. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). It has been argued that under the Indiana standard, police coercion is not necessary for a finding of involuntariness. *See Hurt v. State,* 694 N.E.2d 1212, 1218 (Ind.Ct.App.1998) (citing *Linthicum v. State,* 511 N.E.2d 1026, 1031–32 (Ind.1987) (DeBruler, I., concurring)), *trans. denied.* Wright's claim fails under either standard.

## II. Sentence

### A. Appropriateness

 Wright next challenges the appropriateness of his 165–year sentence in the Department of Correction. Article VII, Sections 4 and 6 of the Indiana Constitution " 'authorize[ ] independent appellate review and revision of a sentence imposed by the trial court.' " *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.2007) (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind.2006) (emphasis and internal quotations omitted)). Such appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that the "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." We exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective a trial court has when making sentencing decisions. *Stewart v. State*, 866 N.E.2d 858, 866 (Ind.Ct.App.2007). It is the defendant's burden to demonstrate that his sentence is inappropriate. *Childress*, 848 N.E.2d at 1080.

Under Indiana Code section 35–50–2–3 (2007), a person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Wright received three consecutive advisory sentences of fifty-five years each.

In challenging his sentence, Wright does not dispute the extraordinary brutality of his crimes but claims that they are largely a reflection of his mental illness rather than his character, making his 165–year sentence overly harsh. In sentencing Wright, the trial court found his mental illness to be a significant mitigating cir-cumstance. The trial court further found, however, that the aggravating circumstances, including the fact of multiple victims, outweighed the mitigating circumstances and justified consecutive advisory sentences.

 Even where there is a strong indication that the crimes at issue are directly attributable to a defendant's mental illness, the mitigating weight of such illness has generally served to favor the imposition of the presumptive or advisory, rather than a reduced, sentence, especially when the nature of the offenses is particularly egregious, as Wright concedes is the case here. *See Lopez v. State*, 869 N.E.2d 1254, 1260–61 (Ind.Ct.App.2007), *trans. denied* (collecting cases). Wright's receiving fifty-five year advisory sentences for each of his murder convictions is consistent with this approach and takes due account of his mental illness. The fact that Wright's sentence adds up to 165 years reflects the fact that he killed three victims. Any lesser sentence would diminish the lives of his victims. " 'In cases involving multiple killings, the imposition of consecutive sentences is appropriate.' " *Scruggs v. State*, 737 N.E.2d 385, 387 (Ind.2000), *quoted in Bostick v. State*, 804 N.E.2d 218, 226 (Ind. Ct.App.2004). We are unpersuaded that Wright's 165–year sentence is inappropriate.

### B. Life Sentence

 Wright finally argues that his 165–year sentence is effectively a life sentence and that he should therefore be entitled to the protections of Indiana Code section 35–50–2–9, which governs sentences of life imprisonment without parole. Life without parole is a specific sentence which is authorized by both Indiana Code sections 35–50–2–8.5 (2007) and 35–50–2–9 in specific instances and applies to sen-

tencing an individual upon one count. *Collins v. State,* 826 N.E.2d 671, 674 n. 8 (Ind.Ct.App.2005), *trans. denied.* In the present case, Wright received his 165–year sentence for the combination of three separate convictions. Further, while Wright's combined sentence exceeds his expected life span, his sentence is nevertheless a term of years and does not officially foreclose the possibility of parole, however slight. Accordingly, under the plain language of section 35–50–2–9, Wright is not entitled to its protections.

### III. Conclusion

Having concluded that the trial court did not abuse its discretion in admitting R.A.'s and Wright's statements into evidence, and having concluded that Wright's 165–year sentence is appropriate and does not warrant the protections of section 35–50–2–9, we affirm Wright's convictions and sentence.

The judgment of the trial court is affirmed.

BAILEY, J., and VAIDIK, J., concur.