

FILED

Jul 12 2016, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Adrian Anthony, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | July 12, 2016 <br><br> Court of Appeals Case No. <br> 49A02-1505-CR-369 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa F. Borges, Judge <br><br> Trial Court Cause No. <br> 49G04-1311-FA-74632 |

**Brown, Judge.**

[1] Adrian Anthony appeals his convictions for two counts of rape, three counts of criminal deviate conduct, attempted criminal deviate conduct, robbery, and burglary as class A felonies, robbery and three counts of carjacking as class B felonies, and robbery as a class C felony, all stemming from his involvement in a home invasion and assault. He appeals his aggregate sentence, and raises three issues which we revise and restate as:

    I.      Whether the evidence is sufficient to support four of his convictions under a theory of accomplice liability;

    II.     Whether his two convictions for rape violate double jeopardy principles; and

    III.    Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] On October 28, 2013, Anthony, Trae Spells, Alexander Dupree, Michael Pugh, and Demetre Brown were at an apartment near 38th Street and Meridian Street in Indianapolis where they drank liquor and smoked marijuana and Spice. The five men drove to a liquor store in a vehicle Pugh had borrowed from another person, purchased vodka, and shared the bottle in the vehicle. The men drove to a neighborhood, obtained powder cocaine, and everyone used cocaine. The men also smoked marijuana dipped in embalming fluid and took some pills. The group eventually went to a house where there were a number of people, and Isaiah Hill joined the group.

The six men left in the car and stopped at a house on 79th Street in Indianapolis and observed the garage door was up and there were two vehicles parked in the driveway and two vehicles parked in the garage. C.P. and E.P. were married, and they and one of their daughters, A.P., who was about twenty-four years old, lived at the house. C.P. and E.P. were sleeping in the upstairs master bedroom, and A.P. slept in her bedroom next to the master bedroom. C.P.'s leg braces and cane, which he uses to walk, were located at the foot of the bed.

Anthony and the other five men exited their vehicle and entered the garage. Anthony and Brown carried loaded .38 revolvers. Spells put on gloves he had brought with him, and the other five men put on gloves they found in the garage. All six men entered the house and immediately went up the stairs. At around 5:15 a.m. on October 29, 2013, Anthony entered the master bedroom with his gun, and E.P. and C.P. awoke to the lights coming on in the room, seeing two men standing in the bedroom brandishing weapons, and hearing multiple male voices loudly telling them to "[g]et up. Come on, come on. Where's the cash." Transcript at 72. The men continually told E.P. to keep her head down and that they would kill her if she looked at them.

A.P. walked out of her room, and someone told Spells to take her back into her room. Spells told A.P. to lay down on the bed in her room, which she did, and Spells and Brown began "ransacking everything" in A.P.'s room looking for things of value, including her computer, television, jewelry, and phone. *Id.* at 994. A.P.'s legs were exposed, and the men made comments about her body,

such as "[y]ou have a nice butt," and one of the men placed his hand "on [her] leg and was rubbing up [her] leg and up to [her] vagina area." *Id.* at 173.

[6] The men shouted at C.P. and E.P. to "stay down, don't look at us" and "where's the money, where's the phones, where's the keys" in "a fairly rapid fire series of [] commands." *Id.* at 264. They shouted several times "if you don't, we're gonna pop you." *Id.* At some point, one of the men asked C.P. to stand up, and he said he would "have to get [his] braces on," and the man said "just lay down." *Id.* at 73. C.P. was ordered to turn onto his stomach, to keep his head covered, and to keep his hands exposed, and he cooperated. The men demanded for cash, phones, and guns.

[7] The six men ransacked the entire house, communicating with each other about what they had found, and electronics and jewelry were loaded into vehicles belonging to C.P., E.P., and A.P. At one point, one of the men loudly demanded the keys to one of the vehicles in the garage from C.P., and C.P. attempted to reply. However, C.P. either did not reply loudly enough or fast enough, and the man took one of the drawers from the nightstand and "just beat over [C.P.'s] head" three or four times, telling him: "when I ask you a question I expect an answer and I expect it now." *Id.* at 277. C.P. blocked the drawer from hitting him in the head using his forearms. Later, a man entered C.P.'s room and ordered him out of bed, C.P. attempted to do so but struggled, and the man said "what's the matter, can't you walk" and "lay your ass back down in the bed." *Id.* at 282.

[8]     At some point, E.P. ran toward another room, Anthony immediately shot her in her lower hip area or leg, and she collapsed. One of the men pulled E.P. back into the hallway, Spells asked him why he had shot E.P., and Anthony replied: "Shut up little Bro. It's what you gotta do." *Id.* at 997. A couple of the men took E.P. downstairs to the kitchen, and the men were going through keys and discussing taking E.P. to an ATM. Every once in a while, E.P. would start to look up a little bit, and somebody would shove her head down and remind her that they would kill her if she looked at them. E.P. was on her hands and knees, the men would hold keys under her face while she was looking down, and E.P. eventually identified the keys to a vehicle in the driveway.

[9]     Upstairs, A.P. was asked if she had any money in the bank, she stated that she had $9,000 in the bank, causing excitement and discussion among the men, and Spells took A.P. downstairs. At some point, E.P. noticed that A.P. had been moved from the upstairs to the downstairs and believed A.P. was in the bathroom. E.P. heard voices, noise, and things being thrown around a lot all throughout the house. E.P. was led outside and attempted to run toward the next door neighbors' house. Someone quickly tackled E.P. as she tripped and fell, she was dragged back into the kitchen, and Anthony shot her in the foot. Another man asked Anthony why he did that, and Anthony stated E.P. had tried to run. E.P. was on the floor, one of the men kicked her hard on her left temple, and she "saw blue and [] saw stars." *Id.* at 97.

[10]    Anthony took E.P. to her vehicle, E.P. and Anthony sat in the backseat, and one of the other men drove toward a bank as E.P. gave directions. Anthony

showed E.P. a debit card, E.P. stated that the card belonged to A.P. and that she did not know A.P.'s pin code, and the man driving turned the vehicle around back toward the house. Anthony pulled E.P.'s sweat pants down, pulled his pants down, and attempted to penetrate her anus with his penis. Anthony was unable to achieve full penetration and penetrated her "[j]ust a little bit," and his hands were all over her breasts and up and down her body. *Id.* at 107. Anthony said "[t]his isn't working. Let's try it a different way," and then he turned E.P. around and, placing his hand on the back of her head, forced his penis into her mouth. *Id.* at 107. Anthony's hand stayed on the back of E.P.'s head, and he touched her body and breast area. The man driving stopped the car in the driveway of E.P.'s house, and Anthony told him that he was almost finished. Anthony ejaculated into E.P.'s mouth and stated "[y]ou better swallow or I'll kill you." *Id.* at 109-110. Anthony had E.P. open her mouth to make sure she had swallowed and then took a sleeve or a piece of material and wiped her mouth out.

[11] Anthony, E.P., and the other man exited the car, Anthony led E.P. to the driver's seat, and Anthony sat in the front passenger seat. Another debit card was placed in E.P.'s hand, and E.P. noticed that it had C.P.'s name on it. E.P. drove to the bank while Anthony pointed a gun at her. E.P. told Anthony that she taught children from three to five years old, Anthony told her that his father had been killed and his mother abandoned him, and E.P. told him that was terrible, that no child should have to grow up that way, and that she was really sorry that had happened to him. E.P. told Anthony that she wanted to help

him, and he said that he did not know how she could help but wished that she could. At the ATM at the bank, Anthony told her to withdraw $800, and E.P. did so and gave the money to him. The surveillance video at the bank indicated it was approximately 6:28 a.m. Anthony told her to try to withdraw more money, she was unable to do so, and he told her to tell the other men, when they returned to her house, that she had withdrawn only $500. After that, E.P. started to drive back to the house.

[12] Meanwhile, at the house, Hill grabbed A.P. by the hair and took her into the bathroom connected to the kitchen. Hill sat on the toilet, had A.P. face away from him, and attempted to have vaginal intercourse with her from behind, but A.P. did not think he was able to achieve full penetration. Dupree leaned back against the sink countertop in the bathroom, said "I'm gonna get head from this girl," placed his hand on the back of A.P.'s head and pushed her mouth up and down on his penis, told A.P. to spit on his penis, threatened to shoot her if she bit him, and told her to "choke on it." *Id.* at 191, 1016. The men talked to each other about A.P.'s body and discussed what they were doing to her.

[13] Hill then took A.P. into the den, placed her on a sofa, and raped A.P. while Spells, Dupree, and Brown watched. A.P. was crying, and Hill said "moan bitch." *Id.* at 204. When Hill stopped, one of the men had A.P. stand up and place her hands on the couch, stood behind her, and attempted to insert his penis into her anus, but was unable to do so. Dupree then penetrated A.P.'s vagina with his penis. When Dupree stopped, Brown grabbed A.P., placed her on the floor, and had sexual intercourse with her. Brown told Spells, "get some

Bro," and Spells inserted his penis in A.P.'s vagina and ejaculated. *Id.* at 1028. Upstairs, C.P. could "hear whooping going on so [he] kn[e]w that there's activity going on in the den." *Id.* at 287. Someone led A.P. back to the bathroom and told her to sit down in the corner of the bathroom, and she did so, wearing only her shirt.

[14] When E.P. and Anthony arrived back at the house, Anthony took E.P. inside and placed her on the floor. E.P. was "just leaking and bleeding it out." *Id.* at 1031. Anthony then took A.P. outside to the vehicle and directed her to sit in the driver's seat. He sat in the passenger seat and pointed a gun at her. Anthony and A.P. could not find A.P.'s debit card, they exited the vehicle, and eventually found the card in the grass. A.P. and Anthony entered the car again, and A.P. drove to the drive-up ATM at the bank. Anthony instructed A.P. to withdraw $800. While at the ATM, Anthony started touching A.P.'s vagina with his hand, and the car jerked forward because A.P.'s foot was on the brake and she reacted suddenly. Anthony continued to touch A.P. and then stopped, and A.P. handed him the $800. Anthony said to try to make another withdrawal, and the withdrawal request was denied. A.P. started to drive, and Anthony told her that she better hurry up or he would shoot her. The surveillance video at the bank indicated that the vehicle left the ATM at approximately 7:04 a.m. At a stoplight on the way back to the house, Anthony told A.P. to kiss him, and she turned and kissed him. When they arrived at the house, Anthony asked where the other men were, E.P. told him they were

gone, Anthony took E.P. and A.P. upstairs and had them lay down, and he left the house.

[15] When the men left, they took three vehicles belonging to the victims. The items taken from the victims' home were placed in a shed in the back of Dupree's mother's house, and the men sold some of the items. A police investigation followed, the victims' three vehicles and a laptop and some of the jewelry taken from the house were recovered, and the men were arrested at various times.

[16] When Anthony was apprehended, he gave law enforcement a false name and told them he was sixteen years old. He later was interviewed regarding his participation in the home invasion and assaults. During the interview, when asked, with respect to E.P., "are we talking about full blown sex here" or "are we talking about just some playing around," Anthony said "Shit, its [sic] like (inaudible) knew where I, I needed type shit," "You know how I could be satisfied," "that's some milf shit, really," "no I actually got experience in that department. Shit, bro, I fell for her bro," "there wasn't no force," and "feel like she was feeling me, yea." State's Exhibit 255 at 53-54. When asked "so did you guys have sex then," he answered "shit bro, I know how, shit I know I came, shit I know I said . . . . damn it." *Id.* at 55. When asked if he used a condom, Anthony said "I ain't even, I done rubbing my own self bro" and "I just release my kids bro, my kids came out bro." *Id.* at 55. When asked about E.P. being shot in the leg and foot and "what I'm confused on is where," Anthony stated "I shot her in her foot too bro cause I told her that," "I didn't want her to think I was playing with her," "I had to let her know that I was

serious," and "I don't want you think this is no joke. This ain't no shit that you dreaming about . . . this is really happening." *Id.* at 58-59. When asked if anyone else did any shooting, Anthony answered "I pulled the trigger," and when asked "both times," he answered "yep." *Id.* at 59.

[17] The State initially charged Anthony with thirty-five counts related to the home invasion and assaults. Anthony was tried together with Dupree, Pugh, and Brown before a jury.[1] The State dismissed seven counts, and the jury found Anthony guilty of the remaining counts. The trial court vacated a number of the convictions and reduced one of his convictions for robbery as a class B felony to a class C felony. Ultimately, judgments of conviction were entered on the following counts: Count III, rape of A.P. inside the bathroom and/or den as a class A felony; Count V, criminal deviate conduct of A.P. inside the bathroom as a class A felony; Count IX, rape of A.P. inside the den as a class A felony; Count XI, attempted criminal deviate conduct of A.P. inside the den as a class A felony; Count XIII, robbery of A.P. as a class B felony; Count XIV, carjacking of a Mitsubishi from A.P. as a class B felony; Count XVIII, robbery of E.P. resulting in serious bodily injury as a class A felony; Count XX, criminal deviate conduct of E.P. as a class A felony; Count XXII, criminal deviate conduct of E.P. as a class A felony; Count XXVII, carjacking of a Ford from E.P. as a class B felony; Count XXXII, carjacking of an Infinity from C.P.

---

[1] Spells testified that he entered a plea agreement, that his understanding is that he could be sentenced to fifty to eighty years, and that he agreed to testify in this case.

as a class B felony; Count XXXIII, robbery of C.P. as a class C felony; and Count XXXV, burglary resulting in bodily injury to E.P. as a class A felony.

[18] At sentencing, the court noted that Anthony was on probation at the time of the offense, that C.P. has a physical infirmity and the men knew it because they knew he had braces at the end of the bed and because it was discussed, that the nature of the offense was "unbelievably aggravating," and that the victims were "in the sanctity of their home where they are not just attacked, not just burglarized or robbed, but humiliated, literally humiliated, and treated as if they were nothing." Transcript at 1429. The court noted Anthony's substance abuse and lengthy criminal history, and entered a supplemental sentencing statement indicating that a mitigating circumstance is that imprisonment will work a hardship on Anthony's dependents, and that the aggravating circumstances include that the harm, injury, loss, or damage suffered by the victim was significant and greater than the elements necessary to prove the offense, that he has a history of criminal or delinquent behavior, that Anthony has recently violated the conditions of probation and pretrial release, and that C.P. was a person with a disability or physically infirm. The court sentenced Anthony to fifty years on Counts III, V, IX, XI, XVIII, XX, XXII, and XXXV, twenty years on Counts XIII, XIV, XXVII, and XXXII, and eight years on Count XXXIII. The court further ordered that Count V be served concurrently with Count III, that Count XI be served concurrently with Count IX, that Count XXII be served concurrently with Count XX, and that Counts XXVII and XXXII be

served concurrently with Count XIV. The court ordered that the remaining sentences be served consecutively for an aggregate sentence of 298 years.[2]

## *Discussion*

### I.

[19] The first issue is whether the evidence is sufficient to support Anthony's convictions on Counts III, V, IX, and XI under a theory of accomplice liability. When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Brasher v. State*, 746 N.E.2d 71, 72 (Ind. 2001). Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt, the verdict will not be disturbed. *Dillard v. State*, 755 N.E.2d 1085, 1089 (Ind. 2001).

[20] Anthony contends the evidence does not support his convictions on Counts III, V, IX, and XI, the sex crimes against A.P., under a theory of accomplice liability. He argues that there was no common plan, that he was not present in the rooms or in the house when the events related to those counts occurred, and that he was unable to oppose the commission of the crimes. He states that his

---

[2] In its brief, the State notes Anthony's sentences and states: "The trial court orally stated a sentence of 318 years at the sentencing hearing. The State's repeated attempts to calculate [Anthony's] sentence results in an aggregate 298-year sentence." Appellee's Brief at 7 (citation omitted).

"companionship with others who committed these crimes, particularly Spells, it must be conceded, was close." Appellant's Brief at 20. He also argues that his conduct before, during, and after the crimes against A.P. shows that he was one of the group that entered the home to steal, that he drove one of the vehicles from the house, and that, during the attacks on A.P., he was taking E.P. to the bank during which time he sexually assaulted her.

The State maintains that the evidence was sufficient to support the challenged convictions under a theory of accomplice liability, that "[b]efore, during, and after the home invasion—from entry into the victims' residence to the storing and selling of the stolen items to the abandonment of the vehicles—all six of the defendants acted together and in concert," that all six defendants were present at the victims' residence and acted with companionship with the others, and that "[n]one of the six opposed the commission of *any* of the crimes committed during the home invasion." Appellee's Brief at 28. The State argues that the plan "was a home invasion with no boundaries or narrow objectives," that "[i]t was clear from the circumstances surrounding the home invasion . . . and the means by which the defendants committed it . . . that this was a no holds barred event," and that "[t]he 'plan' was to enter the residence and victimize the people in it, which was sadly a mission accomplished." *Id.* at 28-29. The State further argues that "sexual assault was clearly within the realm of conduct that the six defendants thought probable during this home invasion," that five of the six men, including Anthony, committed sexual assaults, that "[e]arly on one of the [men] touched A.P. in a sexual way as her bedroom was ransacked," that

"[c]lose in time to when Hill, Dupree, Brown, and Spells were sexually assaulting A.P. in the bathroom and den, [Anthony] was sexually assaulting E.P. in the vehicle," that the "sexual activity, and specifically the assault against A.P., was thus not an outlier in behavior committed during this home invasion," and that Anthony's behavior was at all times consistent with and in furtherance of the victimization of the family as individuals and as a whole. *Id.* at 29. The State also notes that "the jury was presented with and rejected [Anthony's] specific argument that he should not be held accountable under the theory of accomplice liability for the sex offenses against A.P." *Id.* at 30.

[22] In order to convict Anthony on Counts III, V, IX, and XI as an accomplice, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally aided, induced, or caused another person to commit these offenses. *See* Ind. Code § 35-41-2-4. It is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). A person who aids another in committing a crime is just as guilty as the actual perpetrator. *Lothamer v. State*, 44 N.E.3d 819, 822 (Ind. Ct. App. 2015) (citation omitted), *trans. denied*. Moreover, the accomplice is "criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan." *Griffin*, 16 N.E.3d at 1003.

[23]   There is no bright line rule in determining accomplice liability; rather, the particular facts and circumstances of each case must be considered to determine whether a person participated in the offense as an accomplice. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). In order for an accomplice's conviction to stand:

> [T]here must be evidence of his affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn. Each participant must knowingly or intentionally associate himself with the criminal venture, participate in it, and try to make it succeed. That said, the State need not show that [he] was a party to a preconceived scheme; it must merely demonstrate concerted action or participation in an illegal act.

*Griffin*, 16 N.E.3d at 1003-1004 (citations, quotation marks, and brackets omitted).

[24]   In determining whether there was sufficient evidence for purposes of accomplice liability, we consider such factors as the defendant's presence at the scene of the crime; companionship with another at the scene of the crime; failure to oppose commission of the crime; and course of conduct before, during, and after occurrence of the crime. *Tuggle v. State*, 9 N.E.3d 726, 736 (Ind. Ct. App. 2014), *trans. denied*. Accomplice liability applies to the contemplated offense and all acts that are a probable and natural consequence of the concerted action. *Id.*

[25]     The evidence establishes that Anthony, together with five other men, went to the home of C.P., E.P., and A.P. after they abused drugs and alcohol, that the home they targeted was likely occupied, that the men put on gloves, and that two of the men including Anthony carried firearms. The men went immediately to the second floor, confronted the sleeping family, and coordinated with each other during the violent, lengthy invasion and assault, which included completely ransacking the house and shooting E.P. twice. They shared information they coerced from the victims. One of the men touched A.P. in a sexual way as her bedroom was ransacked. The men, individually and together, used terror and intimidation to dominate and control their victims, and under these circumstances "such domination and control can probably and naturally lead to acts of sexual domination and control like rape and criminal deviate conduct." *Pugh v. State* (filed May 10, 2016), Ind. App. No. 49A02-1506-CR-483, slip op. at 9, *trans. pending*. Further, while Hill, Dupree, Brown, and Spells sexually assaulted A.P. in the house, Anthony sexually assaulted E.P. in the vehicle. Later, when Anthony took A.P. to the bank, she was wearing only a t-shirt, and Anthony touched her vagina. During closing argument, Anthony's counsel argued before the jury that the men did not have a common plan, that it is understandable that, "when you take a gun somewhere, it's a natural and probable consequence that somebody might get hurt," that "it's not a natural and probable consequence that he's going to go in and violently rape someone," and that "it's not if someone's there, they're guilty for everything everybody does. It has to have been a normal and natural consequence of what you would expect. It has to make sense. So I would ask

that everything that happened with [A.P.], you not find [] Anthony guilty of." Transcript at 1325-1326. The jury was instructed as to accomplice liability, and was able to consider Anthony's argument and rejected his claim that he was not an accomplice as to A.P. on Counts III, V, IX, and XI. His argument on appeal that he was not an accomplice amounts to a request to reweigh the evidence, which we will not do. *See Tuggle*, 9 N.E.3d at 737 (holding the defendant's argument he was not an accomplice amounted to an impermissible request to reweigh the evidence).

[26] Based upon the record, we conclude that the State presented evidence of a probative nature from which the jury as the trier of fact could find beyond a reasonable doubt that Anthony committed the offenses against A.P. as an accomplice on Counts III, V, IX, and XI.

## II.

[27] The next issue is whether Anthony's convictions under Counts III and IX regarding the rapes of A.P. violate double jeopardy principles. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to

either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*, 717 N.E.2d at 49.

[28] Anthony's argument is that "[t]he only difference is Count 3 was alleged to have occurred 'inside bathroom and/or den' while Count 9 was alleged to have occurred 'inside den,'" that "[i]t is reasonable that the jury may have predicated its finding of guilt on both counts based on the same facts," that "[t]he counts were read to the jurors in their instructions," and that, "[c]onsequently, one of the counts should be vacated as violative of Double Jeopardy." Appellant's Brief at 21. The State argues the convictions on Counts III and IX are supported by different facts, including different times, locations, and defendants.

[29] Anthony confines his constitutional claim to the actual evidence test. In applying the actual evidence test, a defendant must demonstrate and a reviewing court must conclude that there is a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of an offense for which the defendant was convicted or acquitted may also have been used to establish all the essential elements of a second challenged offense. *Hines v. State*, 30 N.E.3d 1216, 1222 (Ind. 2015). In determining the facts used by the factfinder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008); *Spivey v. State*, 761 N.E.2d 831, 832

(Ind. 2002). The "reasonable possibility" standard "requires substantially more than a logical possibility" and "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Lee*, 892 N.E.2d at 1236.

[30] At the time of the offenses, Ind. Code § 35-42-4-1 provided that "a person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when . . . the other person is compelled by force or imminent threat of force . . . commits rape" and that the offense is a class A felony if it is committed by using or threatening the use of deadly force. (Subsequently amended by Pub L. No. 158-2013, § 437 (eff. July 1, 2014); Pub. L. No. 214-2013, § 36 (eff. July 1, 2014); Pub. L. No. 168-2014, § 67 (eff. July 1, 2014)).

[31] The State alleged in Count III that "BROWN, [] ANTHONY, [] DUPREE, [] PUGH, [] SPELLS AND [] HILL, . . . on or about October 29, 2013, did knowingly have sexual intercourse with [A.P.], a member of the opposite sex, when [A.P.] was compelled by deadly force or the threat of deadly force (inside bathroom and/or den)." Appellant's Appendix at 143. The State alleged in Count IX that "BROWN, [] ANTHONY, [] DUPREE, [] PUGH, [] SPELLS AND [] HILL, . . . on or about October 29, 2013, did knowingly have sexual intercourse with [A.P.], a member of the opposite sex, when [A.P.] was compelled by deadly force or the threat of deadly force (inside den)." *Id.* at 146. The jury was instructed on these charges.

[32]     The evidence shows that A.P. was raped first by Hill and then, in turn, by Dupree, Brown, and Spells. This case involves separate and distinct rapes, and the separate acts of rape were not supported by the same evidentiary facts. Testimony was elicited from A.P. and Spells establishing the distinct and separate acts of rape by each of the different men. *See Cleary v. State*, 23 N.E.3d 664, 675 (Ind. 2015) (noting that another case involved two distinct rapes and that the defendant in that case could have been convicted and sentenced for both with no double jeopardy implications). Additionally, in closing argument, the prosecutor argued that A.P. was raped by Hill, Dupree, Brown, and Spells.

[33]     Based upon the record, we conclude that there is no reasonable possibility that the evidentiary facts used to establish the essential elements of rape on Count III were used to establish all the essential elements of rape on Count IX and find no double jeopardy violation with respect to those convictions.

[34]     In addition, we note that Anthony's convictions for robbery under Count XVIII and burglary under Count XXXV were both enhanced to class A felonies based upon the same bodily injury, namely, the two gunshot wounds suffered by E.P. Although Anthony does not challenge the enhancements, we observe that both convictions may not be enhanced based upon the same bodily injury. *See Smith v. State*, 872 N.E.2d 169, 177 (Ind. Ct. App. 2007) (concluding that "if the same bodily injury was used to enhance Smith's conviction of burglary to a Class A felony as was used to enhance his conviction of robbery to a Class A felony, entering a judgment of conviction for both counts would be improper"), *trans. denied*. We order that Anthony's conviction under Count XVIII for robbery as

a class A felony be reduced to robbery as a class B felony and that his sentence on that count be reduced from fifty years of incarceration to twenty years of incarceration, resulting in an aggregate sentence of 268 years.[3]

## III.

[35] The next issue is whether Anthony's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[36] Anthony asserts that his prior involvement with the criminal justice system consisted of true findings in non-violent juvenile offenses and his adult convictions include misdemeanor convictions for possession of marijuana and criminal trespass and class D felony convictions for resisting law enforcement and receiving stolen property. He also argues that, although his offenses were reprehensible, they were not on the same scale as homicide, that he was twenty

---

[3] Further, recognizing that the trial court imposed the maximum sentence on Count XVIII as a class A felony, we are confident the court would do the same even though the conviction has been reduced to a class B felony.

years old when he committed the offenses, and that the sentence meted out by the trial court was virtually a life sentence without parole for him.

[37] The State maintains that Anthony was a leader of his five fellow defendants, was armed with a revolver when he entered the residence, and did not hesitate to shoot E.P. on two separate occasions during the two-hour incident. It points out that Anthony forced E.P. to the bank for money and sexually assaulted her, that he later separately forced A.P. to the bank for cash, and that he "acted more as a principal then an accomplice, was highly culpable for commission of the offenses, and [] concedes that the offenses were reprehensible." Appellee's Brief at 36. The State further maintains that Anthony's character warranted the enhanced sentence, his criminal history is related and violent, he has a pending case involving forty charges of a similar nature as the present convictions, in April 2015 he was convicted of robbery and two counts of murder in another cause, and that it would be absurd to say anything less than that Anthony has an extremely violent character.

[38] We observe that, although Anthony's combined sentence exceeds his expected life span, his sentence is nevertheless a term of years and does not officially foreclose the possibility of parole, however slight. *See Wright v. State*, 916 N.E.2d 269, 279-280 (Ind. Ct. App. 2009) (holding that, while the defendant's combined sentence exceeds his expected life span, his sentence was "nevertheless a term of years and does not officially foreclose the possibility of parole, however slight"), *trans. denied*.

[39]     The nature of the offenses in this case was appropriately described by the trial court as "unbelievably aggravating." Transcript at 1429. The court also stated that the victims were "in the sanctity of their home where they are not just attacked, not just burglarized or robbed, but humiliated, literally humiliated, and treated as if they were nothing." *Id.* Anthony and the other five men invaded the victims' home, threatened and intimidated them, and ransacked their home. The men took property of value including three vehicles, and A.P. and E.P. were forced to withdraw money from their bank accounts. The men terrorized the entire family from approximately 5:15 a.m. until after 7:04 a.m., threatening each of them repeatedly with death. Anthony shot E.P. twice, E.P. was kicked in the head, and C.P. was beaten with a drawer. E.P. and A.P. were sexually assaulted and threatened with death. Four men raped A.P., and A.P. was forced to perform or submit to deviate sexual conduct. Anthony attempted to penetrate E.P.'s anus with his penis and forced her to place his penis in her mouth until he ejaculated. The home invasion and physical and sexual assaults perpetrated by Anthony and the other five men against the victims were horrific and appalling. The nature of the offenses does not warrant a reduction of Anthony's sentence.

[40]     As for Anthony's character, the presentence investigation report (PSI) shows that he was born on March 19, 1993, and that his juvenile history includes true findings for theft as a class D felony if committed by an adult in January 2008, criminal trespass as a class A misdemeanor if committed by an adult in August 2008, and theft as a class D felony if committed by an adult in February 2011.

The PSI also notes that, as a juvenile, Anthony was arrested on fourteen occasions resulting in three true findings. His adult criminal history includes a conviction for possession of marijuana as a class A misdemeanor in January 2012, an arrest for battery as a class A misdemeanor in September 2012 which was dismissed, convictions for criminal trespass as a class A misdemeanor and resisting law enforcement as a class D felony in February 2013, and a conviction for receiving stolen property as a class D felony in October 2013.

[41] According to the PSI, there are three pending cases against Anthony. In the first, the PSI indicates "PENDING – Scheduled for PTC," Anthony was charged with forty counts including two counts of burglary as class A felonies, four counts of robbery as class B felonies, eleven counts of criminal confinement as class B felonies, two counts of intimidation as class C felonies, fourteen counts of forgery as class C felonies, sexual battery as a class C felony, criminal deviate conduct as a class A felony, three counts of battery as class C felonies, and two counts of carjacking as class B felonies. Appellant's Appendix at 345. In the second pending case, Anthony was found guilty of two counts of murder, robbery as a class A felony, and carrying a handgun without a license as a class A misdemeanor, and the PSI indicates that sentencing was scheduled. In the third case, which indicates "PENDING – Scheduled for PTC," Anthony was charged with robbery as a class A felony, criminal confinement as a class B felony, and robbery as a class B felony. *Id.* at 346. The PSI also indicates that Anthony was "[o]n Probation/Parole at Offense." *Id.* at 336.

[42] Anthony reported that he began living on his own at age thirteen, that he moved "because he was 'thuggin'" and he slept in cars or under bridges since that time. *Id.* at 349. He indicated he has three children, that there is no court order in place for child support, and that he "supported his children with 'bankrolls.'" *Id.* at 350. He reported that he has never been employed, that he first consumed alcohol at age eleven with regular use beginning at age thirteen, and that his "pattern of use was on holidays and he would normally consume a fifth of 'whatever.'" *Id.* at 351. He reported that he first used marijuana at age thirteen with the onset of regular use at that time, and he "described his pattern of usage as daily, using a 'fat sack' per day." *Id.* He also reported participating in substance abuse counseling in 2009 at the Indiana Boys' School and in 2008 at Amani Treatment, stating that he successfully completed both programs.

[43] The PSI further provides: "[Anthony] reported feeling 'tired, remorseful' about what occurred and stated in regards to the victims, 'don't know em like that; seem pretty cool.' In regard to how the victims feel about what took place, he noted 'no telling.' He stated 'shit happens' in regards to his feelings regarding crime." *Id.* at 351-352. The PSI states that his overall risk assessment score using the Indiana Risk Assessment System places him in the very high risk to reoffend category. *Id.* at 352. The PSI further states that Anthony "has a great deal of unstructured time and a poor financial situation," that he "has a large number of friends involved in criminal activity, seeks out criminal friends, and has a strong identification with criminal activities," and that he "has significant criminal attitudes, sees no problem in being dishonest, generally engages in

risky behavior, rarely walks away from confrontations, and has some belief in the statement 'do unto others before they do unto you.'" *Id.* The PSI also indicates that Anthony was "assessed for risk utilizing the STATIC-99 risk assessment," which is designed to assist in the prediction of sexual and violent recidivism for sexual offenders, and that, based upon his score, he is placed "in the high (in the top 12%) risk category relative to other adult male sex offenders." *Id.* at 353. His character does not warrant a reduction of his sentence.

[44] After due consideration, we conclude Anthony has not met his burden of establishing that his aggregate sentence is inappropriate in light of the nature of his heinous offenses and his character.

## *Conclusion*

[45] For the foregoing reasons, we affirm the judgment of the trial court in part, reverse in part, and remand with instructions to reduce Anthony's conviction for robbery as a class A felony on Count XVIII to a class B felony and reduce his aggregate sentence to 268 years of incarceration.

[46] Affirmed in part, reversed in part, and remanded.

Kirsch, J., and Mathias, J., concur.