## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 11 2019, 9:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John Andrew Goodridge
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cornelius T. Compton, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 11, 2019 <br><br> Court of Appeals Case No. 19A-CR-1584 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Robert J. Pigman, Judge <br><br> Trial Court Cause No. 82D03-1804-F3-2374 |

**Najam, Judge.**

# Statement of the Case

[1] Cornelius T. Compton appeals his conviction for aggravated battery, as a Level 3 felony, following a jury trial. Compton presents one issue for our review, namely, whether the State presented sufficient evidence to support his conviction.

[2] We affirm.

# Facts and Procedural History

[3] At approximately 1:00 p.m. on April 2, 2018, Officer Joseph Dickinson with the Evansville Police Department ("EPD") responded to a dispatch for a "person down." Tr. Vol. II at 33. As Officer Dickinson approached the location, he observed Compton with a group of black males "walking away from the area." *Id*. at 36. Officer Dickinson rolled his car window down, informed the group that he had received a report that "someone had been beaten," and asked if anyone had seen anything. *Id*. at 37. One member of the group informed the officer that there "was nothing going on here." *Id*. Officer Dickinson circled the area but did not locate anyone on the ground. He ultimately pulled his car into a parking lot at the designated address and saw seventeen-year-old K.W. "slumped forward" in a chair. *Id*. Officer Dickinson attempted to speak with K.W., but K.W. did not respond. Officer Dickinson was unable to find a pulse on K.W., so he called for paramedics.

[4] After the paramedics had arrived, someone called Barbara Wilson, K.W.'s mother, and informed her that the paramedics were working on K.W. At that

point, the paramedics transported K.W. to the hospital, and Wilson followed. When Wilson arrived at the hospital, the doctors informed her that K.W. had died. The doctors then let Wilson see K.W., and she noticed that "there was a big shoe print on his face" that she had not seen on K.W. earlier that day. *Id.* at 30.

[5] At around 2:30 that afternoon, Compton went to the home of Tina Kennedy, who is the mother of K.W.'s best friend. Compton told Kennedy that K.W. and her son "had robbed him" over the weekend. *Id.* at 55. Compton then told Kennedy that he "wanted his items back" and "that he had put [K.W.] in the hospital." *Id.*

[6] After officers learned that K.W. had died, EPD Detective Karin Montgomery went to the hospital to see K.W.'s corpse because she had been told that "he had an odd mark on his face." *Id.* at 62. Detective Montgomery observed that K.W. had "a bunch of little dots" in a "consisten[t] pattern" on the side of his nose, which she thought was "pretty distinctive." *Id.* at 62, 63. Detective Montgomery then spoke with Wilson. While Detective Montgomery was with Wilson, Wilson received a call from Kennedy. Kennedy told Wilson that she "knew who did it." *Id.* at 57. Detective Montgomery then asked to speak with Kennedy, and Kennedy told Detective Montgomery that Compton had "done this" to K.W. *Id.* at 57.

[7] Based on the information she had received from Kennedy, Detective Montgomery interviewed Compton. Compton told Detective Montgomery that

"he didn't have anything to do with" the incident involving K.W. *Id*. at 65. At the end of the interview, Detective Montgomery took possession of Compton's shoes because they "had that similar dotted pattern to them" that she had seen on K.W.'s face. *Id*. at 65. Detective Montgomery then arrested Compton.

[8] The next day, Detective Montgomery conducted a second interview of Compton. During that interview, Compton's story "changed." *Id*. at 66. Compton "admitted that he had been involved in this and it stemmed from the burglary at his home." *Id*. Specifically, Compton admitted that he "did fight that boy," and that he "hit him in his jaw." Ex. 27. However, Compton stated that, at that point, other individuals who knew that K.W. had burglarized Compton's home got involved and began hitting K.W.

[9] Detective Montgomery then sent Compton's shoes to the Indiana State Police Laboratory where Marcus Montooth, a footwear impression analyst, compared images of the marks on K.W.'s face to the soles of the shoes. Montooth observed that the patterns on the soles of Compton's shoes were of a "similar size, [had] similar spacing, and . . . [a] similar shape" as the marks on K.W.'s face. Tr. Vol. II at 114. Montooth further observed that, when he compared the impression from the shoes to the impression on K.W.'s face, the spacing was "even" across the top row, but was "a little bit off" on the next row, which "could potentially be explained" by the compression of the flesh on K.W.'s cheek. *Id*. at 115. Montooth concluded that Compton's shoes "could have made that impression." *Id*. at 111. However, he was unable to definitively conclude that Compton's shoes had caused the marks on K.W.'s face.

[10] The State charged Compton with one count of aggravated battery, as a Level 3 felony, and alleged that Compton was a habitual offender. In addition, the State alleged that Compton had committed the offense while a member of a criminal organization. The trial court held a bifurcated jury trial on March 11 and March 12, 2019.

[11] During the first phase of the trial, the State presented as evidence the testimony of Doctor Christopher Kiefer, the forensic pathologist who had performed an autopsy on K.W. Dr. Kiefer testified that K.W. had received "too many" injuries "to count," which were all "classified as blunt force trauma." *Id.* at 120, 121. Dr. Kiefer further testified that K.W.'s injuries were "consistent" with someone who had been involved in "an altercation between two individuals." *Id.* at 120. Dr. Kiefer testified that, "based on K.W.'s injuries," it appeared that he "was beaten." *Id.* at 125. In addition, Dr. Kiefer testified that "repeated blows to the head" or "a blow to the chest" can cause death. *Id.* at 124, 125. And he testified that, while it is "unclear which injuries . . . might have led to death," he did not find any other injuries on K.W. *Id.* at 120. Rather, Dr. Kiefer testified that K.W. was otherwise "a healthy seventeen-year-old black male."[1] *Id.* at 123.

[12] At the conclusion of the first phase of the trial, the jury found Compton guilty of aggravated battery, as a Level 3 felony. Prior to the start of the second phase,

---

[1] Dr. Kiefer testified that K.W. had an enlarged heart but that his enlarged heart did not appear to be the cause of death.

Compton admitted to being a habitual offender, and the State dismissed the criminal organization enhancement. The trial court entered judgment of conviction accordingly and sentenced Compton to an aggregate sentence of thirty years in the Department of Correction. This appeal ensued.

## Discussion and Decision

[13]   Compton contends that the State failed to present sufficient evidence to support his conviction for aggravated battery, as a Level 3 felony. Our standard of review on a claim of insufficient evidence is well settled:

> For a sufficiency of the evidence claim, we look only at the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh the evidence. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

*Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017).

[14]   To prove that Compton committed aggravated battery, as a Level 3 felony, the State was required to show that Compton knowingly or intentionally inflicted injury on K.W. that caused protracted loss or impairment of the function of a bodily member or organ. Ind. Code § 35-42-2-1.5(2) (2019). On appeal, Compton concedes that the State "established that [he] struck [K.W.] one (1) time, and the strike was a punch," and that the State "established that [K.W.] suffered an injury satisfying the injury element of aggravated battery," namely, death. Appellant's Br. at 28. However, he maintains that the State "wholly

failed . . . to establish that the debilitating injury suffered by [K.W.] was the result of Compton's single punch." *Id*. at 28-29.

[15] We first address Compton's assertion that his attack on K.W. consisted of a single punch and that the State failed to establish that Compton had struck K.W. in the face with his foot. The evidence most favorable to the verdict shows that, when Detective Montgomery observed K.W. in the hospital, she noticed that he had "an odd mark on his face" that consisted of "a bunch of little dots" in a "consisten[t] pattern." Tr. Vol. II at 62, 63. Then, after she had interviewed Compton, she took his shoes from him because they "had that similar dotted pattern to them." *Id*. at 65. Thereafter, Montooth compared an impression from Compton's shoes to the marks on K.W.'s face and discovered that the shoes had a "similar size, similar spacing, and . . . similar shape" pattern as the marks on K.W.'s cheek. *Id*. at 114. He further observed that, when he compared the impression from the shoes to the impression on K.W.'s face, the spacing was "even" across the top row of dots. *Id*. at 115. And even though Montooth could not conclusively determine that Compton's shoes had made the mark on K.W.'s face, he concluded that the shoes "could have made that impression." *Id*. at 111.

[16] Further, Kennedy testified that Compton had told her "that he had put [K.W.] in the hospital" because K.W. had robbed him. *Id*. at 55. And, when officers interviewed Compton for the second time, he "admitted that he had been involved in this and it stemmed from the burglary at his home," and he admitted that he had punched K.W. in the jaw. *Id*. at 66. Based on Compton's

statements to Kennedy and Detective Montgomery, which were admissions against interest, and the fact that the sole of his shoe matched the pattern on K.W.'s face, a reasonable jury could conclude that Compton had also struck K.W. in the face with his foot.

[17] Still, Compton contends that, even if the jury believed that he both punched K.W. and struck him with his foot, those acts were not "causally connected to the injury" that led to K.W.'s death. Appellant's Br. at 32. In essence, Compton maintains that, because there were other individuals involved in the altercation, the State did not prove that any of Compton's overt acts caused K.W.'s fatal injuries. We cannot agree.

[18] The accomplice liability statute provides that a person who "knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." I.C. § 35-42-2-4. Further, a "person who aids another in committing a crime is just as guilty as the actual perpetrator. *Anthony v. State*, 56 N.E.3d 705, 714 (Ind. Ct. App. 2016), *trans. denied*. Indeed, an accomplice is "'criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan.'" *Id*. (quoting *Griffin v. State*, 16 N.E.3d 997, 1002 (Ind. Ct. App. 2014)).

[19] Here, the jury was instructed on accomplice liability. And the evidence demonstrates that Compton and other individuals attacked K.W. because K.W.

had burglarized Compton's home. As a result, K.W. received several blunt force injuries "consistent" with someone who had been involved in an "altercation between two individuals." *Id*. at 120. Indeed, Dr. Kiefer testified that, "based on [K.W.'s] injuries," it appeared that he "was beaten." *Id.* at 125. Further, Dr. Kiefer testified that "repeated blows to the head" or a "blow to the chest" can cause death. *Id*. at 124, 125. And, while Dr. Kiefer could not determine "which injuries . . . might have led to death," he did not observe any other injuries on K.W. Rather, he testified that K.W. was otherwise a "healthy seventeen-year-old black male." *Id*. at 120, 123.

[20] In other words, the evidence shows that K.W. was healthy when Compton and the others beat him, and then K.W. died. Indeed, Compton admitted to having punched K.W., and the evidence demonstrates that he also kicked K.W. in the face. Accordingly, even if Compton did not deliver the hit that actually caused K.W.'s death, Compton participated in the attack on K.W. and was responsible as an accomplice for the consequences. It makes no difference which of the perpetrators delivered the fatal blow leading to K.W.'s death. Thus, we hold that the State presented sufficient evidence to support Compton's conviction for aggravated battery, as a Level 3 felony, and we affirm his conviction.

[21] Affirmed.

Vaidik, C.J., and Tavitas, J., concur.